UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

NEDAH HASSAN,

         PLAINTIFF,  **AMENDED COMPLAINT**

              **ECF CASE**

    -AGAINST-

              **11 CV-5382(JBW)(CLP)**

NEW YORK CITY and POLICE OFFICER CEGELSKI, individually, and in his capacity as a member of the New York City Police Department.

         DEFENDANTS.


------------------------------------------------------------------------ x

**PRELIMINARY STATEMENT**

1. This is a civil action in which plaintiff, Ms. Nedah Hassan ("Ms. Hassan"), seeks relief for the violation of her rights secured by 42 USC 1983, the Fourth and Fourteenth Amendments to the United States Constitution.

2. The claim arises from an incident that occurred on or about September 14, 2011, in which officers of the New York City Police Department acting under color of state law, intentionally and willfully subjected Ms. Hassan to an unreasonable search and seizure.

**3.** Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants and an award of costs and attorneys' fees, and such other and further relief as this Court deems just and proper.

## JURISDICTION

4. This action is brought pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Eastern District of New York in that Defendant City of New York is located within, and the events giving rise to the claim occurred within the boundaries of the Eastern District of New York.

## PARTIES

6. Plaintiff Ms. Hassan is a United States citizen and at all times here relevant resided at 144-53 28th Avenue, Flushing, NY 11354

7. New York City is a municipal corporation organized under the laws of the State of New York.

8. Police Officer Cegelski ("PO Cegelski") (Shield #20126), at all times here relevant was a member of the New York City Police Department, and is sued in his individual and professional capacity.

9. At all times mentioned, defendant was acting under color of state law under color of the statutes, ordinances, regulations, policies and customs and usages of the City of New York.

## FACTUAL ALLEGATIONS

### THE NYPD HAS A POLICY AND PRACTICE OF SPYING ON MUSLIMS IN NEW YORK CITY AND PROMOTING THE PERCEPTION AMONGST THE NYPD THAT MUSLIMS ARE POTENTIAL TERRORISTS

10. The NYPD has a publicly acknowledged and documented policy of spying on Muslims in New York City.

11. As documented by the Associated Press news outlet, the NYPD has spied on Muslim neighborhoods, eavesdropped on conversations between Muslims, and monitored and kept a database of those attending Mosques in New York City.

12. The NYPD has monitored Mosques in Queens, including, upon information and belief, the Mosque on Steinway Street in Astoria, which members of the Hassan family attend, and another Mosque that is just blocks from the Hassan's apartment, which they also attend on occasion.

13. Techniques that have been used by NYPD, and its "Demographics Unit", include putting informants in Mosques, infiltrating student groups, and cataloguing Muslims who change their surnames to "Americanized" names.

14. Assistant NYPD Police Chief Thomas Galati testified about the NYPD's policy of spying on and targeting Muslims in a deposition on June 28, 2012, in which he acknowledged that the NYPD had been targeting Muslims in and around New York City since around 2003.

15. Assistant NYPD Police Chief Galati documented the extensive techniques that have been employed by NYPD in spying on Middle Easterners and Muslims in New York City.

16. On October 23, 2012, the Associated Press revealed how the NYPD used Shamiur Rahman, a paid informant to spy on Muslims in NYC, including attempts to "bait" Muslims into saying inflammatory statements, even though none of the Muslims to whom he spoke had been identified as criminals or had engaged in criminal activity.

17. Shamiur Rahman stated that he attended New York City Mosques and reported on the content of sermons of imams to his NYPD handler.

18. The NYPD's policy of targeting Muslims has been known publicly since August 2011, when the Associated Press first broke the story. However, this practice and policy has existed within NYPD for many years.

19. NYPD showed the extremist anti-Muslim video "The Third Jihad" to more than 1,500 Police Officers in or around 2010 as part of a training program.

20. The Third Jihad video portrays Muslims as potential budding terrorists who pose a violent and deadly threat to the United States, and to New York City.

21. The Third Jihad video perpetuated an image, amongst members of the NYPD, including, upon information and belief members, of the 109th precinct and PO Cegelski, of Muslims as being violent and hostile.

22. The NYPD's policy of spying on and targeting Muslims through the aforementioned tactics has created a culture of fear and distrust of Muslims amongst members of the NYPD, including, upon information and belief, the 109th Precinct and Police Officer Cegelski.

**NYPD OFFICER CEGELSKI PHYSICALLY ABUSES NEDAH HASSAN AS A RESULT OF THE NYPD'S ANTI-MUSLIM POLICY**

23. Ms. Hassan is 32 years old and lives with her three brothers in a second floor apartment.

24. Ms. Hassan is responsible for the upkeep of their home and takes care of all the domestic household duties.

25. The police officers at the 109th Precinct are familiar with Ms. Hassan and her family as several officers of the 109th Precinct have been to Ms. Hassan's apartment and, upon information and belief, are aware that the Hassan family are practicing Muslims.

26. Emil Vlassopoulous, Ms. Hassan's ex-boyfriend has an order of protection against her.

27. On or about September 14, 2011, at approximately 10:30 am, PO Cegelski, a member of the 109th Precinct, knocked on the door of Ms. Hassan's home.

28. Mr. Wesam Hassan ("Wesam"), one of Ms. Hassan's brothers, answered the door to PO Cegelski.

29. Wesam is a practicing Muslim and an Arab.

30. Wesam has tanned skin and dark hair and has the stereotypical appearance of a Muslim.

31. PO Cegelski saw that Wesam has tanned skin and has dark hair.

32. PO Cegelski asked to speak to Ms. Hassan.

33. PO Cegelski was aware that the family name was "Hassan".

34. The surname Hassan is well known as being one of the most popular and traditional Muslim surnames..

35. Wesam informed PO Cegelski that Ms. Hassan was upstairs and that he would go to get her.

36. Wesam instructed PO Cegelski not to enter the building.

37. Wesam requested that PO Cegelski stay at the door while he went to get Ms. Hassan.

38. PO Cegelski had no legal right to enter Ms. Hassan's home.

39. PO Cegelski refused to comply with the request and followed Wesam into the foyer.

40. Wesam again informed PO Cegelski that he would get Ms. Hassan from upstairs and again requested that PO Cegelski remain where he was.

41. PO Cegelski again refused to comply with the request and followed Wesam upstairs.

42. Wesam told PO Cegelski, " I have told you twice, do not come into our home."

43. PO Cegelski ignored Wesam's instructions and followed Wesam into their home.

44. The Hassan family are practicing Muslims and the apartment entrance hallway is adorned with three Middle Eastern posters with Islamic Arabic writing, which are prominently displayed and immediately visible to anyone entering the apartment.

45. Ms. Hassan's parents are originally from Palestine and are proud of their heritage.

46. Ms. Hassan is a practicing Muslim and an Arab – she has tanned skin and dark hair and looks like a stereotypical Muslim female.

47. Upon information and belief, PO Cegelski saw the posters with Islamic Arabic writing.

48. PO Cegelski informed Ms. Hassan that she needed to accompany her to the police precinct.

49. Ms. Hassan requested that she be allowed to go to the bathroom.

50. PO Cegelski refused to allow Ms. Hassan to go to the bathroom.

51. Ms. Hassan informed PO Cegelski that she needed to get a tampon.

52. PO Cegelski again refused her request and blocked her access to the bathroom.

53. Without warning or legal justification, PO Cegelski grabbed Ms. Hassan and pushed her to the floor.

54. Ms. Hassan fell to the floor, hitting her side and back off a dresser.

55. PO Cegelski grabbed Ms. Hassan by the arms and proceeded to drag her across the room.

56. Upon information and belief, PO Cegelski's improper and unwarranted physical abuse of Ms. Hassan was triggered by the NYPD's practice and policy of spying on

6

Muslims in NYC and the NYPD's practice and policy of portraying Muslims as violent and hostile.

57. Upon information and belief, the NYPD's policy of targeting Muslims in NYC led to PO Cegelski having a heightened fear and mistrust of Ms. Hassan and her brothers.

58. Ms. Hassan's brothers shouted at PO Cegelski to leave her alone.

59. PO Cegelski called for more Police Officers.

60. More Police Officers then arrived at the Hassan's home and proceeded to push Ms. Hassan's brothers.

61. One of Ms. Hassan's brothers tried to video tape the incident and was arrested by the police officers.

62. Ms. Hassan was arrested in her apartment and taken to the 109th Precinct.

63. Ms. Hassan was then taken to Flushing Hospital Medical Center where she was treated for the injuries she sustained to her neck, back and arms.

64. The Judge who arraigned Ms. Hassan was appalled by Ms. Hassan's injuries.

65. Ms. Hassan continues to feel traumatized by the events of September 14, 2011, and is wary and fearful when she sees NYPD officers. Ms. Hassan takes efforts to avoid police officers when in public.

66. As a result of the incident, Ms. Hassan suffered neck pain, lower back pain, and soft tissue injuries to her arms, legs and lower back and severe bruising to her arms, legs and lower back.

67. Ms. Hassan feels fear, anxiety, emotional distress, frustration, embarrassment, humiliation, loss of liberty, and financial loss as a result of the incident.

## FIRST CAUSE OF ACTION

(42 USC 1983 – Excessive Force)

68. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

69. Defendants have deprived plaintiff of her civil, constitutional and statutory rights under color of law and are liable to plaintiff under 42 USC 1983.

70. Defendants have deprived plaintiff of her right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, in that defendants used excessive and unreasonable force in effecting the arrest of plaintiff.

71. Plaintiff has been damaged as a result of defendants' actions in an amount believed to equal or exceed the jurisdictional limits of this court.

## SECOND CAUSE OF ACTION

(42 USC 1983 – Monell Claim)

72. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

73. New York City has systematically trained members of the NYPD to improperly target, monitor and discriminate against Muslims.

74. New York City was a final decision maker, and as a matter of policy and practice, has acted with a reckless indifference to plaintiff's rights under the Constitution and laws of the United States.  New York City's improper and unconstitutional targeting and surveillance of Muslims includes monitoring places where Muslims congregate, including Mosques, through the NYPD's Muslim Surveillance Program.

75. NYPD's anti-Muslim training includes such devices as the anti-Muslim video "The Third Jihad".

76. These practices create mistrust, fear, and hostility towards Muslims amongst members of the NYPD and as a direct result led to the constitutional violation of Plaintiff's rights.

77. New York City knew or should have known that the NYPD's Muslim Surveillance Program and anti-Muslim training would likely result in constitutional violations of Muslims.

78. As a result, plaintiff has been damaged plaintiff in an amount believed to equal or exceed the jurisdictional limit of this court.

## THIRD CAUSE OF ACTION

(42 USC 1983 – Improper Search and Seizure)

79. Plaintiff repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

80. Defendant PO Cegelski has deprived plaintiff of her civil, constitutional and statutory rights under color of law and are liable to plaintiff under 42 USC 1983.

81. Defendant PO Cegelski has deprived plaintiff of her right to be free of unreasonable searches, pursuant to the Fourth Amendment to the United States Constitution, in that defendant improperly entered into plaintiff's home and arrested her.

82. Plaintiff has a constitutional right to be free of unreasonable search and seizures.

83. Plaintiff has been damaged as a result of defendants' actions in an amount believed to equal or exceed the jurisdictional limit of this Court.

## JURY DEMAND

84. Plaintiff demands a trial by jury.

WHEREFORE, plaintiff respectfully requests that the court enter a Judgment against defendants together with costs and disbursements as follows:

> In favor of plaintiff in an amount to be determined by a jury, but at least equal or exceeding the jurisdictional limits of this Court;
>
> Awarding plaintiff punitive damages in an amount to be determined by a jury;
>
> Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action;
>
> And such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         December 3, 2012

                                    By:  _____/s/_____
                                         Duncan Peterson


                                         Duncan Peterson
                                         PetersonDelleCave LLP
                                         Attorney for Plaintiff
                                         233 Broadway, Suite 1800
                                         New York, NY 10279
                                         (212) 240-9075